In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 22-2254

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**PATRICK D. THOMPSON,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 21 CR 279 — Franklin U. Valderrama, *Judge*.

# BRIEF OF THE UNITED STATES

JOHN R. LAUSCH, JR.
United States Attorney
  for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

MICHELLE PETERSEN
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED FOR REVIEW ................................................. 1

STATEMENT OF THE CASE ............................................................... 2

SUMMARY OF ARGUMENT .......................................................... 15

ARGUMENT ........................................................................................ 18

I.     Viewed in the Light Most Favorable to the Government, the Jury's Verdicts Were Amply Supported by the Evidence. ................ 18

    A.    Standard of Review .................................................................... 18

    B.    Analysis ....................................................................................... 18

        1.    Substantial Evidence Supported the Jury's Finding That Defendant Told Planet Home and the FDIC That he Owed Only $100,000 or $110,000 and No Higher Amount, as Charged in Counts One and Two. ............................................ 18

        2.    Substantial Evidence Supported the Jury's Finding That Defendant's Statement That He Borrowed Funds for "Home Improvement" Were Made To Influence the FDIC, as Charged in Count Two. ....................................................... 23

II.    Defendant's Statements Were False and Even If They Were Literally True But Misleading, That Would Provide Defendant With No Defense to the § 1014 Charges Against Him ...................... 28

    A.    Standard of Review .................................................................... 28

    B.    Analysis ....................................................................................... 28

        1.    Defendant's Statements Were False Under § 1014. ............... 28

        2.    "Literal Truth" Is Not an Available Defense Under § 1014..... 32

i

3.      The Plain Language of § 1014 Does Not Support a Literal Truth Defense.................................................................... 36

4.      Even if a Literal Truth Defense Were Available Under § 1014, Defendant Could Not Prevail Because His Statements Were Not Literally True. ...................................... 41

III.   Neither the Jury Instructions Nor the Trial Evidence Constructively Amended the Indictment. ......................................... 43

A.    Standard of Review....................................................................... 43

B.    Analysis ........................................................................................ 43

IV.   The District Court Did Not Err in Awarding Restitution to the FDIC. ............................................................................................... 50

A.    Standard of Review....................................................................... 50

B.    Background ..................................................................................... 51

C.    Analysis ........................................................................................ 53

CONCLUSION ................................................................................................ 56

# TABLE OF AUTHORITIES

## CASES

*Bronston v. United States*, 409 U.S. 352 (1973) ........................................*passim*

*Paroline v. United States*, 572 U.S. 434 (2014) .......................................... 54, 56

*United States v. Adcock*, 534 F.3d 635 (7th Cir. 2008) ................................... 51

*United States v. Allen*, 381 F. App'x 617 (7th Cir. 2010) ............................... 51

*United States v. Armbruster*, 48 F.4th 527 (7th Cir. 2022) ........................... 18

*United States v. Attick*, 649 F.2d 61 (1st Cir. 1981) ...................................... 36

*United States v. Bearden*, 274 F.3d 1031 (6th Cir. 2001) ............................... 55

*United States v. Brodie*, 507 F.3d 527 (7th Cir. 2007) ................................... 46

*United States v. Clark*, 787 F.3d 451 (7th Cir. 2015) .................................... 53

*United States v. Cox*, 54 F.4th 502 (7th Cir. 2022) ....................................... 22

*United States v. Cusimano*, 148 F.3d 824 (7th Cir. 1998) ............................. 43

*United States v. Edgeworth*, 889 F.3d 350 (7th Cir. 2018) ............................ 44

*United States v. Ellis*, 50 F.3d 419 (7th Cir. 1995) ....................................... 38

*United States v. Filer*, 56 F.4th 421 (7th Cir. 2022) ...................................... 22

*United States v. Folks*, 236 F.3d 384 (7th Cir. 2001) ..................................... 49

*United States v. Foy*, 50 F.4th 616 (7th Cir. 2022) ....................................... 28

*United States v. Freed*, 921 F.3d 716 (7th Cir. 2019)..............................*passim*

*United States v. Gan*, 54 F.4th 467 (7th Cir. 2022) ....................................... 44

*United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999).................................. 38

*United States v. Haddock*, 956 F.2d 1534 (10th Cir. 1992) ........................... 31

*United States v. Haddock*, 961 F.2d 933 (10th Cir. 1992) ............................. 31

*United States v. Hairston*, 888 F.2d 1349 (11th Cir. 1989) ........................... 55

iii

*United States v. Hall*, 142 F.3d 988 (7th Cir. 1998) ....................................... 46

*United States v. Hathaway*, 882 F.3d 638 (7th Cir. 2018) .............................. 46

*United States v. Heon Seok Lee*, 937 F.3d 797 (7th Cir. 2019) ...... 44, 45, 48, 49

*United States v. Kelerchian*, 937 F.3d 895 (7th Cir. 2019) ............................. 18

*United States v. Khilchenko*, 324 F.3d 917 (7th Cir. 2003) ............................ 45

*United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998) ........................... 37, 39

*United States v. Kucik*, 844 F.2d 493 (7th Cir. 1988) ..................................... 40

*United States v. Kurlemann*, 736 F.3d 439 (6th Cir. 2013) ...................... 39, 40

*United States v. Laikin*, 583 F.2d 968 (7th Cir. 1978) .................................... 33

*United States v. Lane*, 323 F.3d 568 (7th Cir. 2003) ...................................... 29

*United States v. Mitchell*, 15 F.3d 953 (10th Cir. 1994) ........................... 27, 28

*United States v. Mitchell*, 64 F.3d 1105 (7th Cir. 1995) ................................. 48

*United States v. Ongaga*, 820 F.3d 152 (5th Cir. 2016) ............................ 47, 49

*United States v. Phillips*, 731 F.3d 649 (7th Cir. 2013) ............................ 26, 27

*United States v. Rahman*, 805 F.3d 822 (7th Cir. 2015) ................................. 33

*United States v. Rand*, 403 F.3d 489 (7th Cir. 2005) ......................... 50, 51, 53

*United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007) ........................ 48

*United States v. Remsza*, 77 F.3d 1039 (7th Cir. 1996) .................................. 43

*United States v. Reynolds*, 919 F.2d 435 (7th Cir. 1990) ................................ 34

*United States v. Savoie*, 985 F.2d 612 (1st Cir. 1993) .................................... 55

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) ................................... 49

*United States v. Staniforth*, 971 F.2d 1355 (7th Cir. 1992) ........................... 35

*United States v. Sullivan*, 903 F.2d 1093 (7th Cir. 1990) ............................... 26

*United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998) ...................... 29, 30

*United States v. Tantchev*, 916 F.3d 645 (7th Cir. 2019)................................. 42

*United States v. Thorn*, 17 F.3d 325 (11th Cir. 1994)..................................... 35

*United States v. Trennell*, 290 F.3d 881 (7th Cir. 2002) ................................. 43

*United States v. Trice*, 823 F.2d 80 (5th Cir. 1987) .................................. 30, 31

*United States v. Wells*, 127 F.3d 739 (8th Cir. 1997) ..................................... 31

*United States v. Wells*, 519 U.S. 482 (1997) ............................ 26, 27, 31, 32, 35

*United States v. Yasak*, 884 F.2d 996 (7th Cir. 1989)..................................... 19

*United States v. Young*, 908 F.3d 241 (7th Cir. 2018) ..................................... 51

*Williams v. United States*, 458 U.S. 279 (1982) ............................ 35, 37, 39, 40

## STATUTES

18 U.S.C. § 152(3) ......................................................................... 38

18 U.S.C. § 1001(a)(2) ..................................................................... 33

18 U.S.C. § 1014........................................................................*passim*

18 U.S.C. § 1621 .......................................................................... 32

18 U.S.C. § 1623 .......................................................................... 33

18 U.S.C. § 3231 ........................................................................... 1

18 U.S.C. § 3663A(a) ...................................................................... 53

18 U.S.C. § 3742(a) ........................................................................ 1

26 U.S.C. § 7206(1) ................................................................ 1, 12, 34

28 U.S.C. § 1291............................................................................ 1

## RULE

Federal Rules of Criminal Procedure 29 ................................................ 13, 14

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct. Defendant was charged with making false statements to the Federal Deposit Insurance Corporation and a financial institution, in violation of 18 U.S.C. § 1014 (Counts One and Two) and filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts Three through Seven).[1] R. 1. On February 14, 2022, a jury convicted defendant of all counts. R. 141. After sentencing defendant, the district court entered judgment on July 11, 2022 and an amended judgment on July 13, 2022. R. 188, 190; App. 22-39. Defendant timely filed a notice of appeal on July 14, 2022. R. 191. The district court then entered a second amended judgment on July 29, 2022. R. 198; App. 1-21.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED FOR REVIEW

1.     Viewed in the light most favorable to the government, whether sufficient evidence supported the jury's verdicts, specifically: (1) for purposes of both Counts One and Two, that defendant stated that he only owed $100,000

---

[1] Citations to the Original Electronic Record on Appeal and Supplemental Record on Appeal are designated as "R." followed by the document number. Defendant's brief and appendix are cited as "Br." and "App.," respectively. Citations to the trial transcript are cited as "Tr." Citations to hearing transcripts are cited as "Tr.," preceded by the hearing date. The government's trial and sentencing exhibits are cited as "G. Ex.," and defendant's trial and sentencing exhibits are cited as "D. Ex." Page numbers are included where appropriate.

or $110,000 and that any higher amount was incorrect, and (2) for purposes of Count Two, that defendant's statement that his loan was for "home improvement" was made to dissuade the Federal Deposit Insurance Corporation ("FDIC") from collecting the full balance of defendant's loan.

2.     Whether defendant's statements about his loan amount were "false" for purposes of 18 U.S.C. § 1014, and, if literally true, whether literal truth is a defense to § 1014.

3.     Whether the jury instructions or the trial evidence constructively amended the indictment and, in particular, the false statement charged in Count One and one of the false statements charged in Count Two.

4.     Whether the district court erred in awarding the FDIC $50,120.58 in restitution, the unpaid interest related to defendant's loan.

## STATEMENT OF THE CASE

### *Defendant's Loan With Washington Federal Bank for Savings*

Defendant Patrick D. Thompson, a real estate lawyer, was a customer of a local Chicago bank, Washington Federal Bank for Savings ("Washington Federal"). Tr. 449, 800-01.

In November 2011, defendant obtained a $110,000 loan from Washington Federal to make a capital contribution to the law firm where he was employed. Tr. 796-99, 828-30. Defendant signed a note for $110,000. G. Ex. 89. The note referenced a "property address"—defendant's residential

address—and stated that the loan was "secured" by property that could not be "sold or transferred" without Washington Federal's consent. *Id.* at 3. Although the note referenced this security interest, no mortgage documents were ever executed or filed. Tr. 458-59, 523-24.

At or near the time this $110,000 note was signed, Washington Federal issued defendant a letter, stating that defendant's loan payments were "$389.58 interest only" and the "first payment is due January 1, 2012." G. Ex. 90. Defendant made one payment on the loan in early 2012 in the amount of $389.58. G. Ex. 163. After that payment, defendant made no additional payments on the loan (Tr. 459-60), although bank president John Gembara instructed Washington Federal employees to make entries in the bank's records to make it appear as if defendant were making payments (Tr. 492-93).

Over the next several years, defendant communicated frequently with Gembara in an effort to obtain additional bank funds that defendant could use to refinance mortgages he had obtained from other financial institutions on his residence and a Chicago rental property. Tr. 883-86, 890-97, 900-09. The proposed refinancings were never completed. *Id.* However, at Gembara's direction, Washington Federal provided defendant additional funds on two separate occasions, in the form of checks from Washington Federal.

On the first occasion, in 2013, defendant requested funds from Washington Federal so he could make a tax payment to the IRS. In early 2013, defendant had received an IRS notice telling defendant he had delinquent 2011 income taxes and that the IRS intended to levy his property if he did not pay promptly. R. 40 at 3. In March 2013, defendant e-mailed Gembara; "[P]lease respond to me today. I really do need your help." G. Ex. 134. Gembara later instructed a Washington Federal employee to prepare a $20,000 check made payable to defendant (Tr. 461-63), which defendant used to make a payment to the IRS (Tr. 886-89; G. Ex. 166).

On the second occasion, in 2014, defendant requested additional funds from Washington Federal to pay off a mortgage he had obtained from another bank, North Community Bank. R. 40 at 4-5. Defendant's North Community Bank loan was delinquent. *Id*. In 2013 and 2014, North Community Bank attempted to collect on the delinquent loan, and its efforts culminated in January 2014 lawsuit against defendant. *Id*. Defendant's wife was personally served with the complaint at their home on January 22, 2014. *Id.* A few days later, Gembara instructed a Washington Federal employee to generate a check for defendant in the amount of $89,000, which defendant used to pay off the North Community Bank loan. *Id.*; Tr. 465-67, 1070-71.

Defendant signed no additional loan paperwork with Washington Federal in connection with these 2013 and 2014 checks. Tr. 494-96. Indeed, the

only the loan paperwork defendant completed with Washington Federal was the November 2011 note for $110,000. *Id.* When defendant received the $20,000 check in 2013 and the $89,000 check in 2014, Washington Federal added those amounts to the balance of his already outstanding $110,000 loan. *See, e.g.*, G. Ex. 59 at 2.

Additionally, although defendant was not making loan payments, defendant was aware that interest continued to accrue on his loan from Washington Federal and that this interest was being added to the total loan balance. For example, in February 2013, defendant sent an email to Gembara stating that defendant knew he had "unpaid interest . . . for the outstanding loan" and that the unpaid interest was "approximately $4,000." G. Ex. 133. In a March 2013 email, defendant told another Washington Federal employee that he "was under the belief" that his unpaid interest of approximately $6,500 was "being rolled into the loan." G. Ex. 57.

In fact, that is precisely what Washington Federal was doing. On May 24, 2014, bank president Gembara sent defendant an email with the subject line "Loan" and an attachment labeled "Loan Balance," which contained a chart showing defendant's loan balance as $232,273.82. G. Ex. 59. The chart reflected the breakdown of that balance, including the three checks defendant had received from Washington Federal—the $110,000, $20,000, and $89,000

checks—and the fact that unpaid interest in the amount of $13,273.82 had been added to defendant's loan balance:

```
$110,000.00  (Loan Amount)
  13,273.82 (Interest Amount)
$123,273.82
$ 20,000.00  (Loan Advance) 3-22-13
$143,273.82
$ 89,000.00  (Loan Advance)1-24-14
$232,273.82
```

*Id.*

There were other instances where Washington Federal informed defendant that his loan balance was rising to include the $20,000 and $89,000 checks from 2013 and 2014 as well as unpaid interest. Defendant also confirmed the rising balance in writing. In particular:

- In April 2013, a Washington Federal employee emailed defendant paperwork showing his outstanding loan balance was $136,609.55—an amount consistent with the original $110,000 loan, the 2013 $20,000 check, and unpaid interest in the amount of approximately $6,600. G. Ex. 139 at 13.

- In March 2016, defendant signed two separate loan applications under penalty of perjury, listing the outstanding balance of the Washington Federal loan to be $249,050, an amount consistent with the three checks for $110,000, $20,000 and $89,000, and unpaid interest. G. Exs. 102 at 3, 103 at 3. Defendant retained copies of these loan applications in his personal records. G. Exs. 60 at 3, 61 at 5; Tr. 908.

- In early 2017, defendant received a mortgage interest statement, a Form 1098, which stated that his outstanding principal on his Washington Federal loan was $249,049.16 as of

6

January 1, 2016. G. Ex. 216 at 9. Defendant gave that form to his accountant.[2] Tr. 583-84. Defendant also kept in his files an envelope with a handwritten note that referenced the same amount shown on the Form 1098. It read: "Washington Fed $249,049.96?" Ex. 68; Tr. 909-10.

As of December 2018, defendant still retained a number of these documents in his possession, and he provided them to the government in response to a subpoena. *See* G. Exs. 59, 60, 61, 68; Tr. 822, 897, 908-10.

### Defendant's False Statement to Planet Home

In December 2017, Washington Federal failed, and the FDIC became the receiver for Washington Federal.[3] Tr. 780-81, 821. Washington Federal's outstanding loans—including defendant's—became part of the receivership. Tr. 781-82. The FDIC used a contractor to service defendant's loan: financial institution Planet Home Lending ("Planet Home"). Tr. 783-91.

On February 16, 2018, Planet Home sent defendant an invoice showing the Washington Federal loan had a balance of $269,120.58. G. Ex. 72. On February 23, 2018, defendant called the Planet Home customer service phone

---

[2] For tax years 2012-2017, defendant falsely claimed a mortgage interest deduction on his income tax returns for mortgage interest purportedly paid to Washington Federal, even though such payments were not made to Washington Federal, and his loan was not a mortgage loan. Tr. 1116-20; R. 117 at 6. The jury convicted defendant for filing false tax returns from 2013 through 2017 (Counts Three through Seven of the indictment), and defendant does not challenge those convictions on appeal.

[3] Following the failure of Washington Federal, a number of former Washington Federal employees, board members, and customers were indicted for fraudulent conduct that contributed to the bank's failure, including embezzlement and falsifying bank records. *See United States v. Kowalski et al.*, 19 CR 226 (N.D. Ill.), Dkt. 534.

number listed on the invoice. Tr. 917-18. The phone call was audio-recorded. *Id.*; G. Ex. 188.

During the approximately 10-minute call, defendant told the Planet Home customer service representative that he "just received some mail" stating that Planet Home was "the servicer" for a loan from Washington Federal, which had been "taken over by the FDIC." G. Ex. 188; App. 122-23.[4] Defendant stated he was aware that Washington Federal's failure was a "bad situation" because there was "some financial impropriety" at the bank and that Gembara had "commit[ed] suicide." G. Ex. 188; App. 123.

Defendant continued: "[T]he numbers that you've sent me shows that I have a loan for $269,000 dollars. I—I borrowed $100,000. . . . I signed a Promissory Note . . . for $100,000" in "2011." G. Ex. 188; App. 123. Defendant said he had "never received an invoice" from Washington Federal and stated, "I have all kinds of e-mails, and I – I have no idea where the 269 number comes from" because "this doesn't match with anything that I have." G. Ex. 188; App. 123-25. Defendant said he was "shocked" to receive the invoice and that he was "very perplexed. This is a significantly higher, and much more than – remotely of what we were talking about." G. Ex. 188; App. 124, 126. Defendant

---

[4] The audio recording of the call is G. Ex. 188. A transcript of the call was marked as G. Ex. 189 and is located at App. 121-33.

then read the amount on the invoice—"$269,120.58"—and stated, "I dispute that." G. Ex. 188; App. 132.

Defendant further stated that at Washington Federal, he had attempted to take "the $100,000 that [he] had borrowed" and "add it to [his] current" mortgages from other financial institutions to refinance that debt all together. G. Ex. 188; App. 124; *see also* G. Ex. 188; App. 130 (defendant explained he filled out multiple loan applications over the past "five, or six, seven years" to "incorporate the $100,000 with [his] mortgage" on his "house" in order to "combine it all into one and do a new loan"). Defendant said as recently as "like October of last year," meaning 2017, he tried to "refinance my house to take the $100,000, add it to my current [mortgages at other institutions] and refinance everything." G. Ex. 188; App. 124.

Defendant stated he had "no idea what paperwork" Planet Home had, and that he would "like to see it." G. Ex. 188; App. 123. Defendant also asked to "talk to somebody" and "go through the documentation" G. Ex. 188; App. 124. Defendant explained "there never was a closing" or a "mortgage" and that he thought he had "just signed a Promissory Note." G. Ex. 118; App. 126-27. Defendant said he wanted to "quickly resolve all this" and "quickly move forward," asking if Planet Home could have someone get back to him "in a week." G. Ex. 188; App. 127, 131.

9

Defendant stated, "I know – I mean, I borrowed the money, I owe the money – but I borrowed $100 thou – $110 – I think it was $110,000 dollars. . . . I want to quickly resolve all this, and – and – you know, what I owe." G. Ex. 188; App. 127.

***Defendant's False Statements to the FDIC***

On March 1, 2018, two FDIC contractors, John Holly and Dan Newell, spoke with defendant by phone about a Washington Federal loan to the 11th Ward Democratic Organization, an entity with which defendant was associated. Tr. 1002, 1007-10, 1024, 1077. The call was not recorded, though both Newell and Holly kept contemporaneous notes from their conversation with defendant in a shared log. Tr. 1004-05, 1083; App. 134-35.

During the call, Holly and Newell asked defendant about his personal loan from Washington Federal. Tr. 1010-12. As Holly and Newell testified, they told defendant that his loan balance was approximately $269,000. Tr. 1011, 1079. In turn, defendant told Holly and Newell that he had borrowed $110,000 from Washington Federal and that he "disputed" the loan balance Holly had put forth. Tr. 1011-12, 1029, 1079, 1088-89. Defendant also told Newell and Holly that the $110,000 he borrowed from Washington Federal was for "home improvement." Tr. 1012, 1035-36, 1078. Defendant added that he had been dealing with Washington Federal's Gembara. Tr. 1078. Holly and

Newell's contemporaneous notes reflected the following summary of their conversation with defendant:

> [Defendant] spoke about his personal debt 110,000. John Gembara loaned him 110,000 for home improvement, which was to be rolled up into his home loan. . . . He is disputing his balance and is sending us the documentation for this also.

App. 135.

Before their March 1, 2018 call with defendant, Holly and Newell had not located in Washington Federal's records copies of the $20,000 and $89,000 checks that defendant received in 2013 and 2014, respectively. Tr. 1003-04, 1010-12. But after that call, the pair "found the disbursement checks and tracked down where the money went." Tr. 1012. During a March 5, 2018 call, Holly and Newell told defendant they had located two additional distributions of $20,000 and $89,000. Tr. 1015. According to Holly, defendant stated that he "was in doubt that [those distributions] were correct" and that he "would review his records." Tr. 1044; *see also* App. 135.

As detailed further below in connection with defendant's arguments regarding the district court's order of restitution, defendant ultimately repaid the FDIC $219,000 in December 2018. R. 40 at 14. *See infra* at 51-53.

### *Indictment*

On April 29, 2021, defendant was indicted on two counts of making a false statement to the FDIC and Planet Home, in violation of 18 U.S.C. § 1014

(Counts One and Two), and five counts of making a false statement on an income tax return for tax years 2013-2017, in violation of 26 U.S.C. § 7206(1) (Counts Three through Seven). R. 1.

Under § 1014, it is a crime to knowingly make "any false statement or report" for "the purpose of influencing in any way the action" of the FDIC or a financial institution with respect to a loan. Count One alleged that in his February 23, 2018 conversation with Planet Home, defendant "falsely stated that he only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect." App. 115. Count Two alleged that defendant made two false statements to the FDIC on March 1, 2018: (1) "that he only owed $110,000 to Washington Federal" and "that any higher amount was incorrect," and (2) that the funds from Washington Federal "were for home improvement." App. 116.

## *Trial*

A six-day jury trial was held in February 2022, during which the government presented evidence consistent with the offense conduct described above. R. 120-123, 128, 140. The jury convicted defendant of all counts. R. 141. With respect to Count Two, per the special verdict form, the jury found that defendant made both of the charged false statements for purposes of influencing the FDIC. Tr. 1332-33, 1428.

*Defendant's Post-Trial Motion for Acquittal*

Under Federal Rules of Criminal Procedure 29 and 33, defendant filed a post-trial motion for a judgment of acquittal notwithstanding the verdict or, alternatively, a new trial.[5] R.154. Defendant argued that (1) the government presented insufficient evidence for the jury to find that defendant stated he owed only $100,000 or $110,000 and not a higher amount; (2) the government presented insufficient evidence for the jury to find that defendant told the FDIC that the purpose of his loan from Washington Federal was for "home improvement" with intent to influence the FDIC; (3) defendant's statements to Planet Home and the FDIC about the amount he owed were literally true and therefore could not be the basis for a conviction under § 1014; and (4) the difference between the government's proof at trial and the indictment constituted a constructive amendment because the evidence showed that defendant made statements about the amount he "borrowed," not "owed" as alleged in the indictment. R. 154 at 2-13.

The district court denied defendant's post-trial motions. App. 40-102. The court found sufficient evidence established that defendant "knowingly made false statements as charged in Count I and II." App. 70. The court also

---

[5] Defendant also filed a written motion for judgment of acquittal on Counts One and Two after the government announced its intention to rest during its trial. R. 124. The district court orally denied that motion without prejudice. Tr. 1168.

found that the "evidence before the jury consisted of several different facts," including defendant's own words, that "could lead the jury to draw the reasonable inference" that defendant told the FDIC his loan was for home improvement "in order to avoid the FDIC looking closely at all documentation and discovering the additional two loan disbursements." App. 76. The court acknowledged that it "would not have been surprised if the jury had returned a not guilty verdict" related to the home-improvement false statement, "but it matters not, as it is not the role of the trial judge, on a Rule 29 motion, to reweigh the testimony." App. 75.

Citing *United States v. Freed*, 921 F.3d 716 (7th Cir. 2019) among other cases, the district court also found that "literal falsity is not required to sustain a conviction under Section 1014." App. 69. Given that ruling, the court did "not address the Government's argument that [defendant's] statements were literally false." App. 70.

Finally, the district court found that there had been no constructive amendment of the indictment, as such "concerns are mitigated" when the "jury is instructed" that it must find "defendant made the statements as alleged in the indictment—as the jury was instructed here." App. 57-58. Instead, the court concluded that, at most, a "variance" occurred, which "was immaterial." App. 59-61.

*Sentencing*

On July 6, 2022, defendant was sentenced to below-Guidelines sentences of four months' incarceration on each of his seven counts of conviction, with the sentences to be served concurrently. App. 7. Defendant was also ordered to serve one year of supervised release, which he is currently serving. App. 8. Defendant was also ordered to pay restitution to the IRS and to the FDIC. App. 3-4.

## SUMMARY OF ARGUMENT

1.     The jury's guilty verdicts on Counts One and Two were amply supported by the trial evidence. The evidence more than established that defendant told both Planet Home and the FDIC—either precisely as alleged in the indictment or, at the very least, in substance—that he owed $110,000 but no higher amount. Defendant expressly stated that he "owed" (and "borrowed") $110,000, all the while expressing "shock" at the Planet Home invoice reflecting a significantly higher loan balance. Based on the government's evidence—which included defendant's own words and a steady trail of documents establishing that defendant's loan balance was, in fact, $269,000— the jury properly concluded that defendant made the false statement alleged in Count One and the first half of Count Two, in violation of 18 U.S.C. § 1014.

2.     The evidence, and the reasonable inferences it supported, also provided the jury with the necessary foundation to convict defendant under

15

§ 1014 for making the false statement alleged in the second half of Count Two: the funds defendant received from Washington Federal were for "home improvement." Defendant does not dispute that he made this statement and that it was false; he contends only that he did not make the statement with the requisite "intent to influence." But the evidence established otherwise, where defendant made the statement knowing that the scant paperwork Washington Federal maintained in connection with that loan matched his "home improvement" cover story and that Washington Federal's records were in disarray. This evidence, coupled with defendant's insistence that Planet Home move quickly to resolve the dispute over his outstanding loan balance, more than permitted the jury to conclude that defendant made his false "home improvement" statement in an effort to dissuade the FDIC from conducting any additional investigation to unearth the additional $20,000 and $89,000 checks defendant had received from Washington Federal.

3.    Defendant's statements to Planet Home and the FDIC were "false" for purposes of § 1014, where defendant stated that (1) he, alternately, owed and borrowed $110,000 while disputing the higher loan balance, and (2) his Washington Federal loan was for home improvement purposes. Although defendant asserts that his statements were literally true and thus not a basis to convict to him under § 1014, that contention is both factually incorrect and legally irrelevant. It was not literally true that defendant's loan was for home

16

improvement purposes, just as it was not literally true that defendant's citation to a $110,000 loan accurately reflected the extent of his debt. Moreover, neither the Supreme Court nor this Court has held that a literal truth defense should apply to a § 1014 prosecution, a conclusion that fits both the plain language of § 1014 and its legislative history.

4.    The trial evidence did not constructively amend the indictment. (Nor did the jury instructions, which the district court adopted from defendant's proposal.) The trial evidence established a § 1014 offense, the same crime set forth in the indictment, and involved the same statements set forth therein. At most, any difference between the evidence and the indictment amounted to a variance, but because defendant had notice of the government's evidence and robustly defended against it, any variance would be harmless.

5.    The district court did not err in awarding the FDIC restitution in the amount of unpaid interest that had been added into defendant's loan balance before his charged false statements. Defendant's false statements were a proximate cause of the FDIC's loss, as they prompted the FDIC negotiating a settlement that forwent the collection of unpaid interest.

## ARGUMENT

### I.   Viewed in the Light Most Favorable to the Government, the Jury's Verdicts Were Amply Supported by the Evidence.

#### A.   Standard of Review

This Court reviews *de novo* the denial of a defendant's motion for acquittal pursuant to Rule 29, considering evidence in the light most favorable to the government. *United States v. Kelerchian*, 937 F.3d 895, 907 (7th Cir. 2019) (quotation omitted). A conviction may be set aside only if "no rational trier of fact could have found the defendant guilty." *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022) (quotation omitted). Under this "highly deferential standard," a conviction will be overturned only where "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *Id.* at 535 (quotation omitted).

#### B.   Analysis

##### 1.   Substantial Evidence Supported the Jury's Finding That Defendant Told Planet Home and the FDIC That he Owed Only $100,000 or $110,000 and No Higher Amount, as Charged in Counts One and Two.

The district court instructed the jury, in relevant part, that to convict defendant on Count One, it needed to find that defendant falsely stated to Planet Home "that he only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect" and that to convict defendant for one of the false statements charged in Count Two, it needed to find that

defendant told the FDIC "that he only owed $110,000 to Washington Federal and that any higher amount was incorrect." Tr. 1323-25.

On appeal, defendant does not dispute the propriety of these instructions. Nor does defendant dispute that the government did not have to prove that he used the exact words alleged in the indictment, but was required only to prove that defendant made the charged statements in substance. *See United States v. Yasak*, 884 F.2d 996, 1002 (7th Cir. 1989) (perjury indictment need not "reiterate the exact words of the perjured testimony" as long as it states "such testimony in substance" (quotation omitted)). Here, a properly instructed jury, presented with ample evidence from the government, correctly found that defendant made the charged statements, either precisely as alleged in the indictment or, at the very least, in substance.

As to Count One, there is no dispute over what defendant said during the audio-recorded phone call to Planet Home. G. Ex. 188; App. 121-33. Defendant called Planet Home after receiving an invoice with a loan balance of approximately $269,000. G. Ex. 72. During this call, defendant repeatedly stated that the invoice amount was incorrect. Approximately nine minutes into the call, defendant stated: "But I know – I mean, I borrowed the money, I *owe* the money – but I borrowed $100 thou – $110 – I think it was $110,000. . . . I want to quickly resolve all this, and – and – you know, what I *owe*." G. Ex. 188; App. 127 (emphases added). In other words, defendant claimed that he

borrowed (only) $110,000 and that he owed only that amount. Thus, contrary to defendant's claim that he said, "nothing at all about what he owed" (Br. 14), defendant told Planet Home—twice—that he owed $110,000.

Defendant also used the term "borrow," but he used that term interchangeably with "owe" to describe the funds he needed to pay the FDIC. Defendant repeatedly referred to the "borrowed" $100,000 or $110,000 or the note for "$100,000" in the context of claiming that he did not need to pay—i.e., that he did not owe—the loan balance printed on Planet Home's invoice. G. Ex. 188; App. 123, 124, 127. Defendant claimed to be "shocked" and "perplexed" as the loan balance reflected on the invoice "was significantly higher, and much more than – remotely of what we were talking about." G. Ex. 188; App. 124, 126. At another time during the call, defendant even went so far as to tell Planet Home that he had "no idea" where the $269,000 balance came from. G. Ex. 188; App. 123. In other words, throughout the call, defendant repeatedly stated, both explicitly and in substance, that he borrowed, and therefore owed, only $100,000 or $110,000, and that any information Planet Home had that indicated a higher loan balance was incorrect.

Based on defendant's own statements to Planet Home—including his multiple expressions of shock and confusion regarding the $269,000 loan balance—the jury had more than enough evidence from which it could conclude that defendant made the false statement charged in Count One about what he

owed the FDIC, both explicitly and in substance. The jury's conclusion is particularly well-founded when the evidence is assessed, as it must on appellate review, in the light most favorable to the government.

Similarly, with respect to Count Two, the trial evidence showed that defendant misrepresented to the FDIC the extent of his debt. FDIC contractors Holly and Newell testified that they told defendant his loan balance was approximately $269,000. Tr. 1011, 1079. Holly and Newell both testified that defendant told them his loan was only for $110,000 and that he disputed the $269,000 balance.[6] Tr. 1011-12, 1029, 1079, 1088-89. Holly and Newell's testimony was corroborated by their contemporaneous notes of the conversation, which included the following language: "Mr. Thompson spoke about his personal debt 110,000," "John Gembara loaned him 110,000 for home improvement," and "[h]e is disputing his balance." App. 135; Tr. 1009, 1083. Defendant argues that because Holly and Newell's notes do not specifically mention the $269,000 loan balance, Holly and Newell did not actually discuss

---

[6] Defendant points to testimony from Holly, Newell, and the Planet Home representative indicating that each thought defendant truly did not realize how much he owed. Br. 6, 7; Tr. 1011, 1033, 1091, 1184. But the fact that defendant's lies may have been convincing merely underscores that he acted in an attempt to influence the FDIC and Planet Home, a necessary element under § 1014. Moreover, defendant does not argue on appeal that the evidence failed to show that he *knowingly* made false statements. Even if that were defendant's challenge, the jury heard ample evidence that defendant knew his steadily increasing loan balance. *See supra* at 5-7 (summarizing records defendant received from, and conversations defendant had with, Washington Federal showing his true loan balance in 2013 through 2017, as well as other documents defendant had in his possession reflecting that information).

that balance with him during the call. Br. 15. But Holly and Newell both testified they told defendant his loan balance of approximately $269,000 (Tr. 1011-12, 1079), and even if the notes' omission, or Holly and Newell's testimony on cross-examination, could be viewed as conflicting, it was proper for the jury to credit their testimony that they discussed the $269,000 figure with defendant. "It is the province of the jury, not the court, to weigh the conflicting evidence." *United States v. Filer*, 56 F.4th 421, 436-37 (7th Cir. 2022); *see also United States v. Cox*, 54 F.4th 502, 517 (7th Cir. 2022) ("[I]t is well settled that [an appeals court] does not weigh in on credibility issues when reviewing a verdict.").

Defendant's reliance on Holly and Newell's negative responses to questions on cross-examination about whether defendant ever said he only owed $110,000 and no higher amount is misplaced. Br. 15. Both Holly and Newell also testified that defendant told them he borrowed $110,000 *and that he disputed the higher loan balance of $269,000*. Tr. 1011-12, 1029, 1079; *see also* Tr. 1088-89 (Newell testified defendant "did say he owed $110,000" but in reality, defendant "owed more than $110,000.") Viewing the evidence and reasonable inferences to be drawn from it in the light most favorable to the government, the jury was entitled to find that defendant's statements to Holly and Newell, in substance, were that he owed $110,000 and no higher amount, even if he did not use the precise words teed up on cross-examination.

At bottom, there was sufficient evidence to support the jury's verdicts on Count One and the first false statement charged in Count Two.

> ### 2. Substantial Evidence Supported the Jury's Finding That Defendant's Statement That He Borrowed Funds for "Home Improvement" Were Made To Influence the FDIC, as Charged in Count Two.

Count Two alleged a second false statement: that the funds he owed Washington Federal were for "home improvement." Defendant does not dispute that jurors were properly instructed that, to convict defendant under § 1014 in connection with this statement, they needed to find that defendant made "the statement with the intent to influence the action of the [FDIC] in collecting money owed by the defendant to the [FDIC]." Tr. 1325. Defendant contends only that the evidence failed to establish that purpose.[7] Br. 27-30. Contrary to defendant's contention, the trial evidence, which included defendant's own words and actions from February and March 2018, were sufficient to permit the jury to find that defendant told the FDIC the purpose of the $110,000 loan was for "home improvement" in an effort to influence the FDIC not to dig deeper into Washington Federal's records and find evidence of the additional $20,000 and $89,000 he borrowed from the bank.

---

[7] On appeal, defendant has asked the Court to assume the evidence established he, in fact, told the FDIC that the loan's purpose was for "home improvement." Br. 27, n. 10.

First, it is undisputed that defendant used none of Washington Federal's three checks for home improvement purposes. Yet defendant's "home improvement" statement was consistent with the 2011 note he had signed. That note referenced a "Property Address" (listed as his home address), stated that a "Security Instrument" was executed, and further stated that if "any part of the Property or any Interest in the Property is sold or transferred" without Washington Federal's consent, the bank may "require immediate payment." G. Ex. 89. During his call with Planet Home, defendant directed Planet Home's attention to the 2011 note, saying "I signed a Promissory Note . . . for $100,000" in "2011" G. Ex. 188; App. 123. When he told Planet Home that he had "just signed a Promissory Note" with no formal "closing" (G. Ex. 188; App. 126-27, 129), he knew that he had borrowed an additional $20,000 and $89,000 in 2013 and 2014 for which he did not sign any additional documents, such as a note (Tr. 494-96).

Defendant's other comments demonstrated that he hoped to avoid having to repay the additional money he received in 2013 and 2014 and accrued interest. He knew Washington Federal's records were in disarray, specifically mentioning that Washington Federal had failed, and that there had been some "financial impropriety" which led to his main contact at the bank, Gembara, "end[ing] up committing suicide." G. Ex. 188; App. 123. Defendant also made clear that he wanted to resolve the loan dispute "quickly." G. Ex. 188; App. 127.

24

He asked if someone from Planet Home could get back to him "in a week." G. Ex. 188; App. 131.

This evidence, and the reasonable inferences it supported, permitted the jury to conclude—as it did—that defendant told Planet Home that his loan was for "home improvement" because his story would match the scant amount of paperwork readily available from Washington Federal. By providing Planet Home with an easily verifiable, albeit incomplete, answer, defendant hoped the FDIC would not pursue the matter further and that his two other checks from Washington Federal would remain undiscovered.

Defendant dismisses this argument as "wild and convoluted speculation." Br. 29. But the government presented it to the jury which, by convicting defendant, clearly credited it. Tr. 1350 (in closing, the government argued that defendant lied so it would appear that "the note matched the purpose" of the loan, so the paperwork did not "raise any red flags" that would cause Planet Home to look more closely at defendant's loan history and find the other checks). In contrast, the jury rejected defendant's argument—the same one he advances on appeal—that the FDIC did not "care whether [the loan] was for home improvements or a buy-in to a law firm or just because you

like to set money on fire," so defendant's "home improvement" statement "was not made for the purpose of influencing anybody." Tr. 1395.[8]

Defendant also argues that the government did not present evidence from the FDIC about how defendant's false "home improvement" statement could have influenced it. Br. 28-29. No such evidence was required. The relevant inquiry was whether defendant intended to "influenc[e] in any way the action" of the FDIC—not whether the FDIC actually could have been influenced by defendant's statement. 18 U.S.C. § 1014. Materiality is simply not an element of § 1014, *see United States v. Wells*, 519 U.S. 482, 484 (1997)— a point defendant concedes (Br. 27). Instead, § 1014 "cover[s] 'any' false statement that meets the other requirements in the statute, and the term 'false statement' carries no general suggestion of influential significance." *Wells*, 519 U.S. at 490. It is "no defense that [defendant] didn't succeed in influencing" the financial institution or FDIC, "or even that [defendant] couldn't have succeeded." *United States v. Phillips*, 731 F.3d 649, 652 (7th Cir. 2013) (en banc); *see also Wells*, 519 U.S. at 494 ("It does not lie with one knowingly

---

[8] Defendant tries to find support in *United States v. Sullivan*, 903 F.2d 1093, 1099 (7th Cir. 1990), which is factually dissimilar. Br. 30. In *Sullivan*, this Court reversed a defendant's conviction for conspiracy with intent to distribute cocaine when the government put forward no evidence of any co-conspirators and merely argued that defendant must have gotten the drugs from "someone" and "he intended to deliver or sell it to someone here in Chicago." 903 F.2d at 1099. The jury here, in contrast, was presented with specific evidence of defendant's intent, including defendant's own words at the time of his false statement.

making false statements with intent to mislead. . . to say that the statements were not influential or the information not important" (quotation omitted)). All that is required is that the "speaker knows the falsity of what he says and intends it to influence the institution." *Wells,* 519 U.S. at 499.

False statements under § 1014 nonetheless are often material because statements made to influence are "not usually about something a banker would regard as trivial." *Wells*, 519 U.S. at 499. And materiality can be relevant to whether a defendant acted with intent to influence—because a defendant's lie about something irrelevant may serve as circumstantial evidence that defendant lacked the requisite mens rea. *Phillips*, 731 F.3d at 652-55. But materiality is not dispositive in § 1014 prosecutions. As this Court explained in *Phillips*, in the context of a false statement on a loan application, "even if the bank didn't care what was on the loan application," a defendant could be guilty of § 1014 if he "thought they were influencing the bank" with his lie. *Id.* at 655.

*United States v. Mitchell*, 15 F.3d 953 (10th Cir. 1994), also supports that proposition. *Mitchell* involved a § 1014 where a defendant—like defendant here—lied to a financial institution with the intent to "defer collecting payment" on a loan. *Id.* at 956. The defendant in *Mitchell* falsely represented to a financial institution where he had an outstanding loan that an asset he had pledged as collateral for the loan was still available to the bank as security.

27

*Id*. The Tenth Circuit affirmed defendant's conviction, even though the bank was "not attempting or contemplating collection of the loan" when the false statement was made, the bank was not "actively influenced" by the false statement, and once the bank discovered the false statement, it "obtained new collateral" and "did not press for collection." *Id*. *Mitchell* explained: "It was not necessary to prove that the bank was actively influenced by the misleading statement. It is intent to influence that is vital, and actual reliance need not be proved in a § 1014 case." *Id*.

Here, too, the evidence supported the jury's conclusion that defendant made his "home improvement" representation with the intent of deterring the FDIC from collecting defendant's loan in full, even if ultimately the FDIC was not influenced by the false statement. Nothing more was required.

## II. Defendant's Statements Were False and Even If They Were Literally True But Misleading, That Would Provide Defendant With No Defense to the § 1014 Charges Against Him.

### A.    Standard of Review

Questions of statutory interpretation are reviewed *de novo*. *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022).

### B.    Analysis

#### 1.    Defendant's Statements Were False Under § 1014.

Section 1014 makes it a crime to knowingly make a "false statement or report" for "the purpose of influencing in any way the action" of the FDIC or a

financial institution with respect to a loan. 18 U.S.C. § 1014. The statute is "broad," seeking to protect financial institutions and regulators from losses caused by false statements. *United States v. Freed*, 921 F.3d 716, 723 (7th Cir. 2019). It requires no evidence of materiality or reliance by the victim institution. *See United States v. Lane*, 323 F.3d 568, 583-84 (7th Cir. 2003).

Defendant's statements here were "false" for purposes of § 1014—and thus a jury properly convicted him under the statute. He told the FDIC's contractors that his loan from Washington Federal was for "home improvement" when the initial funds were undisputedly used for a law firm capital contribution. And in two separate conversations, he disclosed only the $110,000 he initially received from Washington Federal—without disclosing the bank's two later checks to him and the steadily accumulating interest and while disputing Planet Home's and the FDIC's records of defendant's total loan balance. Because defendant's statements falsely represented that he owed only the lesser amount, he was culpable under § 1014.

This Court's precedent supports the conclusion that defendant made false statements in violation of § 1014, including his statements referencing an outstanding debt limited to $110,000. In *United States v. Swanquist*, 161 F.3d 1064, 1068-71 (7th Cir. 1998), the defendant failed to list all his debts when applying to various banks for loans. For example, the defendant applied for a home mortgage loan and, as part of that process, "submitted a self-created

29

personal financial statement" where he disclosed "truck and trailer loans in the amount of $35,000, and notes payable in the amount of $189,000" when defendant "actually had approximately $47,000 in truck and trailer loans, and approximately $542,000 in outstanding notes payable." *Id.* at 1069-70. At trial, defendant, "testifying on his own behalf, stated that his financial statements and loan applications were not false because all of the allegedly undisclosed information was either disclosed elsewhere" or were "not required to be disclosed." *Id.* at 1070. He argued, in essence, that his statements regarding the $35,000 in truck and trailer loans and $189,000 in notes payable were not, in fact, false. The jury rejected that defense and, on appeal, this Court affirmed, explaining  that "the jury could rationally have concluded that . . . [defendant] should have disclosed all of his loans . . . on the financial applications." *Id.* at 1071-72. In other words, the defendant's statements in *Swanquist*—which could have been characterized as "half-truths"—provided a solid basis for conviction under § 1014.

This Circuit's recent decision in *Freed* is consistent. In *Freed*, defendant delivered a presentation to a bank which described "the proposed 'Line of Collateral'" as including "one hundred percent" of notes obtained through tax increment financing ("TIF"), stated that the cost to sell the notes was $0, and represented that the proceeds to be derived from the notes' sale would be well over $7 million. 921 F.3d at 723. What defendant did not disclose was that

30

"[t]he notes were already double pledged and thus unavailable to serve as collateral." *Id.* Defendant challenged his conviction on the ground that his statements were "technically true" because the presentation never expressly stated that the TIF notes were *available* as collateral. *Id.* This Court rejected that defense and affirmed the jury's verdict finding defendant guilty under § 1014, as the presentation's representations were "false" within the meaning of the statute. *Id.*

Other federal appeals courts have upheld § 1014 convictions under similar factual circumstances. For example, in *United States v. Haddock*, 956 F.2d 1534, 1549-51 (10th Cir. 1992), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997), the defendant negotiated with a bank to obtain a $711,000 loan, but failed to list outstanding debts on a personal financial statement. The Tenth Circuit affirmed defendant's conviction under § 1014, holding that "[f]ailure to list outstanding loans on a form financial statement or loan application constitutes a false statement under § 1014."[9] *Id.* at 1551. *Accord United States v. Wells*, 127 F.3d 739, 744 (8th Cir. 1997) (jury was properly instructed that under § 1014, "[a] statement or representation is 'false' when it is untrue or effectively conceals" a fact); *United States v. Trice*,

---

[9] The Tenth Circuit subsequently granted a limited rehearing to address a count of the indictment other than the § 1014 counts; on rehearing, the panel did not discuss the earlier holding regarding what constitutes a false statement for purposes of § 1014. *United States v. Haddock*, 961 F.2d 933 (10th Cir. 1992).

823 F.2d 80, 86 (5th Cir. 1987) (failing to disclose information "needed to avoid deception in connection with a loan transaction" is a false statement under § 1014).

At bottom, under this Circuit's precedent, defendant's statements here— both about the purported purpose of his loan and the extent of that debt—were "false statements" for purposes of § 1014.

### 2. "Literal Truth" Is Not an Available Defense Under § 1014.

Even if defendant's statements could reasonably be characterized as literally "true," that would provide no basis for overturning the jury's verdicts. As indicated by the cases discussed above, a "literal truth" defense recognized has no application to § 1014 prosecutions.

Defendant argues to the contrary by relying on *Bronston v. United States*, 409 U.S. 352 (1973). Br. 20-21. In *Bronston*, the Supreme Court held that the federal perjury statute, 18 U.S.C. § 1621, does not reach a witness's answer that is literally true, but unresponsive, even assuming the witness intends to mislead his questioner by the answer, and even assuming the answer is arguably false by "negative implication." *Id.* at 359, 361-62. But *Bronston* involved perjury charges, and § 1014 is not a perjury offense. *See Wells*, 519 U.S. at 491 ("Congress did not codify the crime of perjury or comparable common-law crimes in § 1014"). Moreover, neither the Supreme Court nor this Court have extended *Bronston* to the § 1014 context—and for

good reason. In articulating a literal truth defense, *Bronston* focused on two factors fundamental to the perjury context: (1) the availability of trained questioners (i.e. lawyers) able to formulate precise questions that avoid ambiguous or misleading answers; and (2) the effect that the absence of a literal truth defense would have on the "adversary testimonial system." 409 U.S. at 358-59. These issues have far less, if any, relevance in the context of § 1014.

With respect to the first factor, *Bronston* centered its analysis on the idea that perjury often occurs during testimony, and if a non-responsive or incomplete answer is given by a witness, "it is the lawyer's responsibility to recognize the evasion" and ask additional questions to "flush out the whole truth." 409 U.S. at 358-59. This Court has repeated that rationale when discussing *Bronston* in perjury matters. For instance, in *United States v. Laikin*, when assessing the sufficiency of evidence for a conviction under 18 U.S.C. § 1623 (criminalizing false declarations before grand juries), this Court explained that "[t]he rationale of the *Bronston* case was that an unresponsive answer should put the questioner on notice of the need to pin the witness down with more precise questioning." 583 F.2d 968, 971 (7th Cir. 1978). Similarly, in *United States v. Rahman*, 805 F.3d 822, 838-39 (7th Cir. 2015), this Court extended *Bronston's* literal truth defense to a defendant convicted under 18 U.S.C. § 1001(a)(2) (criminalizing false statements made in matters within a

33

federal agency's jurisdiction) because a law enforcement officer failed to ask follow-up questions that could have resolved defendant's ambiguous answers.[10] In contrast, false statements punishable under § 1014 do not typically occur in response to targeted questioning by seasoned interrogators; rather, they occur in more informal and less adversarial communications with bank employees. *Bronston*'s first rationale for the literal truth defense is thus far less transferable to the typical § 1014 setting.

*Bronston's* second rationale for a literal truth defense in perjury cases is also unsuited to § 1014. *Bronston* focused on dangers that might arise if a jury were invited to parse a witness's "unresponsive answer[s]" for evidence of culpability. 409 U.S. at 359. It explained:

> A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether he does not believe (his answer) to be true. *To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of "intent to mislead" or "perjury by implication."*

---

[10] This Court has also applied the literal truth defense to at least one case involving a government form, as opposed to dynamic questioning, but where the form required precise answers to questions that cannot be characterized as "open-ended." *See United States v. Reynolds*, 919 F.2d 435, 437 (7th Cir. 1990) (involving a conviction under 26 U.S.C. § 7206(1), which "is a perjury statute").

*Id.* (quotation omitted) (emphases added). In other words, *Bronston* expressed concern that the possibility of a perjury charge, minus a literal truth defense, could dissuade witnesses in court proceedings from testifying or otherwise could compromise their testimony. These same concerns simply do not carry over to § 1014, where the possibility of a false-statement charge is quite unlikely to dissuade individuals from applying for a loan or otherwise using a financial institution's services.

Defendant cites additional cases which do not discuss *Bronston* in support of his proposition that "literal truth" is a defense to a § 1014 charge. (Br. 17-21). At least two of defendant's cases do not even involve a "statement" for purposes of § 1014. *See Williams v. United States*, 458 U.S. 279, 284-85 (1982) (holding that the act of presenting a check to a bank, drawn on an account with insufficient funds, was not a statement at all); *United States v. Thorn*, 17 F.3d 325, 327-28 (11th Cir. 1994) (defendant "made no statement," not even an "implied statement" when he delivered a title insurance policy to the bank that did not list an outstanding mortgage). And a third involved a statement that was simply not false. *See United States v. Staniforth*, 971 F.2d 1355, 1361-62 (7th Cir. 1992), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997) (defendant truthfully represented that the bank

would acquire security interest in stock that, at the time, was owned by defendant, had value, and had not yet been liquidated).[11]

*Bronston*'s literal truth defense is therefore inapplicable to § 1014.

### 3.    The Plain Language of § 1014 Does Not Support a Literal Truth Defense.

Section 1014 reads:

> Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . a Federal land bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, . . . the Small Business Administration in connection with any provision of that Act, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, any Federal home loan bank, the Federal Housing Finance Agency, the Federal Deposit Insurance Corporation, the Farm Credit System Insurance Corporation, or the National Credit Union Administration Board, a branch or agency of a foreign bank . . . or a mortgage lending business, or any person or entity that makes in whole or in part a federally related mortgage loan . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the

---

[11] In *United States v. Attick*, 649 F.2d 61, 63 (1st Cir. 1981), which defendant also relies on (Br. 18), the First Circuit stated that a defendant "cannot be convicted under 18 U.S.C. § 1014 if the statement claimed to be false is, in fact, literally true." But *Attick* went on to affirm defendant's convictions under § 1014 because the charged statement was not, in fact, "literally true." *Id.* at 65. And in making this determination, *Attick* examined the context for defendant's statement, including by examining Rhode Island contract law and its application to an agreement between the bank and defendant's entity that bore on the accuracy of defendant's statement. In other words, *Attick* examined more than just defendant's words—and instead examined how those words would have been understood by the bank—before concluding that a jury properly concluded that they were not the "literal truth."

36

acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1014.

This statutory language is "capacious." *Freed*, 921 F.3d at 723. Nothing in it limits the phrase "any false statement" to statements that are expressly false nor does the statute's plain language excludes statements that are impliedly so. Instead, § 1014 is "cast in broad disjunctive terms," and as *Freed* explained, precisely because "Congress hoped to effort to protect federally insured institutions from losses stemming from *false statements or misrepresentations that mislead the institutions* into making financial commitments, advances, or loans." *Id.* (citing *Williams*, 458 U.S. at 294 (Marshall, J., dissenting) (emphasis added). *See also Williams*, 458 U.S. at 288 (explaining that § 1014 was written in 1948 to combine "13 existing statutes, which criminalized *fraudulent practices* directed at a variety of financial and credit institutions, [in]to a single section") (emphasis added); *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998) (describing the text of § 1014 as "straightforward and broad," applying to "'any' statement made for the purpose of influencing in 'any' way the action of 'any' of the covered institutions in 'any' application"). In asking this Court to make a literal truth defense available in § 1014 prosecutions, defendant advocates for a curiously restrictive reading of a plainly broad statute.

37

Moreover, a broad reading of § 1014 is supported by this Court's similarly broad reading of other statutes that serve similar purposes as § 1014. For example, 18 U.S.C. § 152(3) prohibits "knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement" in a bankruptcy proceeding, and in *United States v. Ellis*, 50 F.3d 419, 423-25 (7th Cir. 1995), this Court held that a "false statement" under § 152(3) included "omissions of . . . material information." In reaching this conclusion, *Ellis* explained that the statutory purpose behind bankruptcy statutes such as § 152 was to protect bankruptcy courts, which "depend on petitioners to provide truthful and complete information" and "have the right to expect that the petitions filed will reflect accurately the financial situation of the petitioner." *Id.* at 423; *accord United States v. Gellene*, 182 F.3d 578, 586-87 (7th Cir. 1999) (Section 152 has an "expansive scope" because it was "Congress' attempt to criminalize all the possible methods by which a debtor . . . may attempt to defeat the intent and effect of the Bankruptcy Code"). *Ellis* therefore reasoned: "If we are to be faithful to the congressional intent, omissions . . . must be treated, for purposes of § 152, in the same manner as blatantly false statements." 50 F.3d at 425. As noted above, § 1014 was similarly enacted to protect financial institutions and their regulators from losses caused by customers providing false information. Under this backdrop, just as in *Ellis*,

38

there is no need to read limitations into the term "false statement" that are not present on the face of the statute.

To be sure, as defendant argues (Br. 22-24), the Sixth Circuit has held otherwise. *United States v. Kurlemann*, 736 F.3d 439, 445-46 (6th Cir. 2013), concluded that "half-truths," "material omissions" or "concealments" are not included in § 1014's prohibition of "any false statement." *See also id.* ("[Section 1014] does not cover misleading statements, false pretenses, schemes, trickery, fraud or other types of deception."). *Kurlemann's* analysis, however, is flawed for at least two reasons.

First, in interpreting the statute's plain language, *Kurlemann* does not grapple with the congressional intent behind § 1014. As summarized earlier, this Court has described § 1014 as a "broad" statute designed to protect financial institutions from "statements" and "misrepresentations" that are both "false" and "mislead[ing]." *Freed*, 921 F.3d at 723. Second, *Kurlemann* is based on an overly expansive reading of *Williams*. There, as noted earlier, the Supreme Court held that, for purposes of § 1014, "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" 458 U.S. at 284. *See also Krilich*, 159 F.3d at 1029 (reiterating that *Williams* held that a check makes no "statement" at all other than providing "an instruction for the drawee bank to pay"). The *Williams* majority, in other words, had no reason to decide whether § 1014 covered both expressly false statements as

39

well as statements that were impliedly so. *Kurlemann* nonetheless concluded that "[a]fter *Williams*, a false-statement prosecution under § 1014 cannot generally be premised on implied representations" and must instead "turn on true-or-false representations later shown to be false." 736 F.3d at 447. In contrast to *Kurlemann*, this Court has read *Williams* narrowly, describing *Williams* as "merely hold[ing] that checks cannot be considered factual assertions." *Freed*, 921 F.3d at 723-24 (Section 1014's prohibition on false statements includes "a promise [to a financial institution] made with a present intent not to keep it" as "*Williams* cannot be read to mean that promises are categorically beyond the reach of § 1014"). *Kurlemann's* reasoning thus is not sound.

Defendant fares no better with his reliance on *United States v. Kucik*, 844 F.2d 493, 499 (7th Cir. 1988), for the proposition that a "false pretense"— but not a false statement—is "any untrue representation, including an implicit one." Br. 19. But *Kucik* did not attempt to define "false statement" and also stated that it was "unlikely" that the Supreme Court would "distinguish a false statement from a false pretense." 844 F.2d at 500. More to the point, whatever language other false statement, fraud, or perjury statutes might use—i.e., whether they refer to a defendant's statements, representations, omissions, concealments—the fact remains that nothing in the plain language of § 1014, nor its underlying legislative history, purports to limit the statute's scope to

40

any particular kind of false statement. Where a literal truth defense is therefore unavailable to defendant under his statute of conviction, the jury's verdict should be affirmed.

### 4. Even if a Literal Truth Defense Were Available Under § 1014, Defendant Could Not Prevail Because His Statements Were Not Literally True.

Even under a literal truth defense, defendant cannot prevail because his statements to Planet Home and the FDIC were not literally true.

It was not literally true that defendant had initially taken out a loan from Washington Federal for "home improvement" purposes because defendant, in fact, had borrowed the initial funds for his law firm capital contribution. Tr. 796-99, 828-30. And it was not literally true that defendant "owe[d]" or "borrowed" "$110,000" from Washington Federal when, in fact, defendant received two additional checks from the bank and when unpaid interest was steadily accumulating on his total loan. G. Ex. 188; App. 127.[12]

---

[12] Defendant erroneously asserts that during the June 3, 2022 hearing on defendant's post-trial motions, the government conceded that defendant's statements were literally true. Br. 16 (citing 6/3/22 Tr. 11:4-6). The government instead described analogous situations where a statement may have a "kernel of truth" but the failure to disclose the entirety rendered the statement "false." 6/3/22 Tr. 8-11. The government made consistent statements during oral arguments on the Rule 29 motion that occurred during trial. *See* Tr. 1157 (defendant's statement that he "borrowed $110,000 . . . while literally true, is not the whole story because he knew he received $219,000" plus interest); Tr. 1161 (the falsity of defendant's statement is evaluated through the "totality of the circumstances" and, in context, his statements that he borrowed and owed $110,000 were "not true").

Defendant told Planet Home that he had "no idea" where the $269,000 figure on Planet Home's invoice came from; that it was "significantly higher and much more than – remotely of what we were talking about"; and that $269,000 figure "doesn't match anything that I have." G. Ex. 188; App. 123-24. In reality, defendant had received multiple communications from Washington Federal showing his rising loan balance (*See, e.g.,* G. Exs. 59, 139, 216 at 9) and maintained in his possession copies of two loan applications which he signed in 2016 under penalty of perjury, stating his loan balance with Washington Federal at that time was $249,050 (G. Exs. 60, 61, 102, 103; Tr. 822, 904, 908). In other words, it was not literally true that defendant "borrowed" or "owed" $110,000, while feigning ignorance of the $269,000 figure. *Cf. United States v. Tantchev*, 916 F.3d 645, 650-52 (7th Cir. 2019) (holding that a statement could not be literally true when the evidence supported a jury's finding that defendant understood the false nature of his statement from the context of the conversation).

Because defendant's statements to Planet Home and the FDIC were not literally true, defendant's convictions under § 1014 should stand.

### III.  Neither the Jury Instructions Nor the Trial Evidence Constructively Amended the Indictment.

#### A.  Standard of Review

Typically, this Court considers whether a constructive amendment occurred as a question of law reviewed *de novo*. *United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002). But where a defendant did not raise a claim related to constructive amendment in the district court, including by affirmatively agreeing to the jury instructions, the defendant has waived the claim for purposes of appeal. *See United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir. 1998). In the alternative, defendant has forfeited the claim, and on plain-error review of constructive amendment claims, the Court considers whether the amendment "constitute[d] a mistake so serious that but for it the [defendant] probably would have been acquitted." *Id.* (citing *United States v. Remsza*, 77 F.3d 1039, 1043 (7th Cir. 1996)).

#### B.  Analysis

Defendant was convicted of the exact same false statements charged in the indictment's Count One and (as relevant to his argument on appeal) Count Two.[13] No constructive amendment thus occurred.

---

[13] Defendant does not argue that a constructive amendment occurred in connection with the second false statement alleged in Count Two: that his loan was for "home improvement." Br. 24-27.

A constructive amendment can be caused when either the jury instructions set forth, or trial evidence proves, "an offense not alleged in the indictment." *United States v. Heon Seok Lee*, 937 F.3d 797, 806 (7th Cir. 2019). Defendant does not—indeed, cannot—argue that the jury instructions constructively amended the indictment. The district court used *defendant's* proposed instructions about the false statements—instructions which contained the indictment's language about the substance of the false statements. R. 127 at 4, 6; Tr. 1253-60, 1323-25.[14] And as noted earlier, defendant does not challenge these instructions on appeal. *See supra* at 19. Therefore, defendant has waived any objection to these instructions as a potential basis for a constructive amendment of the indictment. *See United States v. Edgeworth,* 889 F.3d 350, 355 (7th Cir. 2018) (waiver occurs when defendant "affirmatively approves an instruction to the jury") (internal citation omitted); *United States v. Gan*, 54 F.4th 467, 478 n.1 (7th Cir. 2022) ("even plain-error review not available for invited errors in jury instructions") (citation omitted).

---

[14] At defendant's request, the jury was instructed that it needed to find, for Count One, that "defendant falsely told Planet Home Lending that he only owed $100,000 or $110,000 to Washington Federal and that any higher amount was incorrect," and for Count Two, that defendant made at least one of the following false statements: (1) that "defendant stated he only owed $110,000 to Washington Federal and that any higher amount was incorrect" or (2) "defendant stated that the funds from Washington Federal were for home improvements." R. 127 at 4, 6; Tr. 1254-60, 1323-25.

Nor did the trial evidence cause a constructive amendment. Constructive amendments based on evidence occur when the evidence involves "a complex set of facts distinctly different from the one alleged" in the indictment. *Heon Seok Lee*, 937 F.3d at 806 (quotation omitted). According to defendant, this scenario occurred here, where the indictment alleged that he made one false statement—that he owed $110,000—and the evidence proved a different false statement—that he borrowed $110,000 and disputed a higher balance. Br. 24. But these variations simply represent different interpretations of the same conversation; the trial evidence did not prove a "distinctly different" set of facts from that alleged in the indictment. Defendant argued to the jury that defendant "didn't say he only owed $110,000," as charged in the indictment, because instead he said he "borrowed $100 or $110,000, and he disputed that the $269,000 was correct." Tr. 1383. The jury rejected defendant's argument, as they were entitled to do, by viewing the defendant's statements in context. The district court concluded the same when denying defendant's post-trial motion for acquittal. App. 59 ("The Court finds that here, *in context*, the evidence presented did not establish offenses 'different from or in addition to those charged by the grand jury.'") (citing *United States v. Khilchenko*, 324 F.3d 917, 920 (7th Cir. 2003)) (emphasis added).

For the first time on appeal, defendant argues a new theory of constructive amendment: that the jury could have found defendant's statement

referencing the $110,000 loan to be false because he owed interest on the loan. Br. 25. Defendant did not advance this claim in the district court, either during trial or in his post-trial motion.[15] R. 124 at 8; R. 154 at 5-6. The decision to present some grounds but not others evinces a deliberate decision to forego a claim, not a mere oversight, and results in waiver, not forfeiture. *See United States v. Hathaway*, 882 F.3d 638, 641 (7th Cir. 2018); *United States v. Brodie*, 507 F.3d 527, 531-32 (7th Cir. 2007). But even on plain-error review (*see United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998)), no constructive amendment occurred regarding the interest evidence, let alone one that was plain.

The trial evidence established that defendant owed unpaid interest on his loan. Washington Federal repeatedly told defendant the unpaid interest was being added to his loan balance. *See, e.g.*, G. Exs. 57, 59, 139. By adding unpaid interest to that balance and not demanding payment from defendant, Washington Federal was, in effect, allowing defendant to "borrow" funds to cover the unpaid interest. In his conversations with Planet Home and the FDIC, defendant concealed that fact from those entities. By stating that he only owed $110,000, defendant omitted not just the $20,000 and $89,000 checks, but also the unpaid interest that had been incorporated into his overall

---

[15] For example, defendant did not object to the portions of the government's closing arguments that he cites in his brief, where the government referenced defendant's unpaid interest. Br. 25; Tr. 1338-39, 1343, 1411.

loan balance. In other words, the unpaid interest did not represent a "distinctly different" set of facts from those alleged in the indictment; defendant's false statement regarding the $110,000 figure inherently incorporated that interest.

*United States v. Ongaga*, 820 F.3d 152 (5th Cir. 2016), which the district court found persuasive in rejecting defendant's constructive amendment claim, supports this conclusion. App. 58. There, the Fifth Circuit analyzed an alleged discrepancy between an indictment's allegation that defendants had falsely claimed on an immigration form that they entered into a "bona fide marriage" and the trial evidence, which included the immigration form itself. *Ongaga*, 820 F.3d at 162-64. That form did not use the precise term "bona fide," but instead asked defendants to affirm that the "marriage was entered into in accordance with the laws" and "not for the purpose of procuring an immigration benefit." *Id.* at 162. *Ongaga* found no constructive amendment, as the "government's allegations and the evidence . . . shared the same common nucleus"— statements on the immigration form about their marriage—rather than "false statements on different immigration forms" or "false statements pertaining to anything but the defendants' marriages." *Id.* at 164. Similarly, here, the government's allegations and evidence regarding the difference between the $110,000 figure and defendant's true loan balance—a balance that reflected two additional checks *and* unpaid interest—also shared a "common

nucleus," meaning any possible discrepancy between the indictment and the evidence did not amount to a constructive amendment. *Id.*

To the extent any concerns about constructive amendment lingered, as the district court explained when denying defendant's post-trial motions, any such concerns were mitigated because the jury was provided a copy of the indictment (R. 129) and instructed to find defendant made the false statements charged therein. App. 57-58, 60. *See Heon Seok Lee*, 937 F.3d at 808 n. 5 (constructive amendment concerns mitigated when jury was provided with a copy of the indictment and told the government had to prove "the crimes it alleged"); *United States v. Mitchell*, 64 F.3d 1105, 1112 (7th Cir. 1995) (no constructive amendment occurred when jury was instructed that it had to find defendant possessed the drug "charged [in the indictment] at the time and place alleged"). This directive severely undercuts any argument that the jury found defendant guilty of an offense different than the one charged in the indictment.

What remains is the possibility that any difference between the instant indictment and the trial evidence amounted to a variance. *See United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007) (if "the terms of the indictment are unaltered, but the evidence offered at trial proves facts materially different than those alleged in the indictment" then a variance, not a constructive amendment, has occurred). Courts have found variances where slight

variations in relevant language, and interpretations thereof, arise. *See, e.g.*, *Ongaga*, 820 F.3d at 164. (describing the discrepancy between the immigration form's language and the indictment's reference to "bona fide" marriage as "[a]t most . . . a variance" and a harmless one at that); *United States v. Sorich*, 523 F.3d 702, 716-17 (7th Cir. 2008) (harmless variance occurred where the indictment alleged that defendant falsely stated he "had never heard" of a group getting preferential treatment but trial evidence proved that defendant said "he didn't have any knowledge" about that group's preferential treatment).

A variance is only fatal, however, if it deprives the defendant of an opportunity to prepare a defense or exposes him to a risk of being prosecuted twice for the same offense. *Heon Seok Lee*, 937 F.3d at 807. Here, defendant can make no such claim. The government specifically identified the conversations containing the false statements, providing defendant with a copy of the audio recording for Count One and the FDIC's contemporaneous notes for Count Two. R. 159 at 11. Armed with that notice, defendant repeatedly "defended against" that evidence through "his opening and closing statements" and "by cross-examination of government witnesses." *United States v. Folks*, 236 F.3d 384, 392 (7th Cir. 2001). Defendant's argument that his statements were about what he borrowed, not what he owed, was a constant theme at trial. *See, e.g.*, Tr. 317 (in his opening, defendant stated that told Planet Home that

49

he "believe[d]" he borrowed $110,000, and by calling Planet Home, he was merely "seeking to clarify" and get "help"); Tr. 1033 (asking FDIC contractor Holly on cross-examination if there is a "difference between what you borrow and what you owe"); Tr. 1383 (arguing in closing that defendant said to Planet Home that "he borrowed $100 or $110,000" and disputed his balance, but "[h]e didn't say he only owed, he didn't even use the word owed"); Tr. 1384 (asserting in closing that the "principal balance wasn't $269,000" because it included "all the interest that Gembara added" to the loan balance); Tr. 1389 (pointing to Holly and Newell's notes in closing and arguing "please show me on [the notes] where [defendant] said I only borrowed $110,000 and no higher amount? He didn't say that.").

In short, no constructive amendment occurred where the trial evidence did not prove a crime different than the one alleged in the indictment and where, at most, any difference in the false statements charged and proven constituted a harmless variance.

## IV.   The District Court Did Not Err in Awarding Restitution to the FDIC.

### A.     Standard of Review

The district court's legal authority to issue a restitution order is reviewed *de novo*, with the calculation of the restitution amount reviewed for abuse of discretion. *United States v. Rand*, 403 F.3d 489, 493 (7th Cir. 2005). The

government must demonstrate the correct amount of the restitution award by a preponderance of the evidence. *Id.* A district court's factual determinations in support of a restitution calculation are reviewed for clear error. *See United States v. Allen*, 381 F. App'x 617, 619 (7th Cir. 2010) (citing *United States v. Adcock*, 534 F.3d 635, 643 (7th Cir. 2008)); *see also United States v. Young*, 908 F.3d 241, 246 (7th Cir. 2018).

## B.    Background

Following his March 1, 2018 phone call with FDIC's Holly and Newell, during which defendant disavowed any debt other than the $110,000 loan, the FDIC discovered the two additional checks for $20,000 and $89,000 that Washington Federal gave defendant in 2013 and 2014. Tr. 1012. They confronted defendant with them (Tr. 1015-16, 1044), and defendant began settlement negotiations on his debt with John Mallaber, a Planet Home employee (D. Ex. 77 at 27-29). During those negotiations, Mallaber recalled, defendant "didn't think he owed interest [on the Washington Federal loan] for certain reasons." *Id.* at 11, 41. For example, on October 8, 2018, defendant emailed Mallaber: "I completely disagree on the entire debt. Washington Federal did not charge me any interest as we never formally closed on the loan and they never invoiced me" except for two invoices in 2011. R. 184 at 21; G. Ex. 196 at 3. In his email, defendant indicated he was only willing to pay any interest that accrued after the FDIC took over the loan in late 2017, not any of

the interest that had accrued pre-2017 while Washington Federal was solvent. *Id.*

Ultimately, in December 2018, the FDIC agreed to a settlement where defendant would pay the loan's principal amount—$219,000 (representing the three distributions of $110,000, $20,000, and $89,000)—but not any unpaid interest. R. 184 at 22. Mallaber recommended that the FDIC accept less than the full amount because "the collectability was questionable." D. Ex. 77 at 40. Mallaber explained that defendant was "playing defense on what's owed" by contesting he owed interest, and citing issues with the loan paperwork, Mallaber also expressed concern over FDIC's litigation risk.[16] D. Ex. 77 at 42-43. Ultimately, the FDIC accepted the settlement (App. 146), and defendant paid it $219,000 in early December 2018 (R. 40 at 14).

During defendant's sentencing proceedings, the government sought $50,120.58 in restitution for the FDIC—a figure representing unpaid interest as of February 2018, before defendant his false statements either to Planet Home or the FDIC. R. 177 at 16-17. The government calculated that amount by subtracting the $219,000 that defendant paid as part of his settlement with the FDIC from the total amount on the invoice that defendant received from

---

[16] Mallaber's concerns with the loan paperwork included the unsecured nature of the loan, and the fact that defendant's wife never signed the note even though she purportedly was a signatory to the loan. D. Ex. 77 at 26, 30, 42-43; App. 143-46.

Planet Home in February 2018. *Id*. The $50,120.58 figure excluded any interest that had accrued after defendant's false statements.

Defendant objected to awarding restitution to the FDIC, arguing there was "no loss resulting from the specific conduct for which he was convicted." R. 172 at 11-12. At sentencing, the district court overruled defendant's objection. It recognized that "a restitution award is authorized only with respect to loss caused by the specific conduct that is the basis of the offense of conviction" (App. 108), but found that the unpaid interest "is encompassed within the circumstances of the offense for which Mr. Thompson has been convicted." App. 111-12. The court reasoned: "In the charged statements in Count 1 and Count 2, he falsely represented that he owed only 110,000 rather than the full amount of approximately 269,000, which did include interest." *Id*. The district court thus ordered restitution to the FDIC in the amount of that unpaid interest: $50,120.58. *Id*.

## C.    Analysis

The district court did not err in awarding the FDIC restitution in the amount of unpaid interest as of the time of the charged conduct. Under 18 U.S.C. § 3663A(a), restitution is mandatory for losses sustained by the "specific conduct that is the basis of the offense of conviction." *Rand*, 403 F.3d at 493-94. The victim must be "directly and proximately harmed as a result of the commission" of the offense. *United States v. Clark*, 787 F.3d 451, 463 (7th Cir.

53

2015). Proximate cause is a "flexible concept" that "defies easy summary" but generally means there is "some direct relation between" the loss and the offense of conviction. *Paroline v. United States*, 572 U.S. 434, 444 (2014) (quotations omitted). In other words, "[e]very event has many causes," but a proximate cause is one that has a "sufficient connection to the result." *Id.*

While properly recognizing that loss could only be awarded if the loss was "caused by the specific conduct that is the basis of the offense of conviction," the district court did not clearly err in finding that the losses to the FDIC caused by the unpaid interest were "encompassed within the circumstances" of Counts One and Two. App. 108, 111-12. The FDIC's loss was clearly caused by defendant's false statements. Before he made the false statements, defendant received an invoice from Planet Home listing the outstanding balance of his loan as $269,120.58, which included unpaid interest. Defendant could have paid that balance and made the FDIC whole. He did not, choosing instead to claim, falsely, that he only owed $110,000 and that he was "shocked" because the invoice balance purportedly did not "match with anything I have" and was "significantly higher" than what he discussed with Washington Federal. G. Ex. 188, App. 123-26. His lies were a proximate cause of the FDIC not being paid in full as it demanded back in early 2018.

Defendant argues that his false statements did not proximately cause any loss because the FDIC voluntarily entered into a settlement with

54

defendant. Br. 31-32. However, civil settlements do not preclude restitution awards to victims in the full amount of their losses (minus funds already repaid). Restitution is a "criminal penalty meant to have deterrent and rehabilitative effects," and parties cannot "simply agree" to a lower amount through a settlement. *United States v. Savoie*, 985 F.2d 612, 619 (1st Cir. 1993); *see also United States v. Bearden*, 274 F.3d 1031, 1040-41 (6th Cir. 2001) (collecting cases). In *United States v. Hairston*, the Eleventh Circuit rejected a defendant's argument that a bank's losses were proximately caused by the bank's own failure to negotiate a better settlement, holding that restitution in the full amount of the victim bank's losses was appropriate when the settlement was for loss "based on fraud" committed by defendant. 888 F.2d 1349, 1354 (11th Cir. 1989). *Hairston* explained: "Although [defendant's] attorney suggested in argument possible ways [the victim] might have reduced its loss, he offered no evidence at all to rebut the evidence the [victim] had lost $25,000." *Id.*

Here, too, defendant does not dispute that interest had accrued on his loan, nor does he dispute the FDIC was never paid that interest. Br. 31-33. The FDIC had to contemplate, and eventually enter into, a settlement only because instead of paying the interest owed, defendant lied about his loan balance (which included interest). Had defendant simply paid the entirety of what he owed—or at least made honest admissions regarding the extent of his debt—

the FDIC would not have been forced into a position where it had to assess its litigation risk and accept, as a compromise measure, a settlement that excluded interest. This is not a case where the "causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline*, 572 U.S. at 445. Therefore, the district court's award of restitution was not in error.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that defendant's convictions on Count One and Two and sentence be affirmed.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

GEORGIA N. ALEXAKIS
Assistant United States Attorney
Chief of Appeals, Criminal Division

/s/ *Michelle Petersen*
MICHELLE PETERSEN
Assistant United States Attorney

## RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because it contains 13,553 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:      /s/ *Michelle Petersen*
MICHELLE PETERSEN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-7655

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2023, I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:     /s/ *Michelle Petersen*
        MICHELLE PETERSEN
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois
        (312) 886-7655